UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X          Case No. 15-cv-04455
ANEURY PERALTA,

                        Plaintiff

-against-


THE CITY OF NEW YORK, POLICE
OFFICER STEVEN GLINER, Shield No.
26865, POLICE OFFICER SHAUN
TABLANTE, Shield No. 20199,
SERGEANT JOHN FERRARA, Shield
No. 1746,

                      Defendants
----------------------------------------------------X          **AMENDED COMPLAINT**

       Plaintiff, by his attorneys, LAW OFFICES OF K.C. OKOLI, P.C., complaining of the defendants, alleges as follows:

## JURISDICTION AND VENUE

       1.     Jurisdiction is founded upon the existence of a Federal Question.

       2.     This action is brought pursuant to the Civil Rights Acts, 42 U.S.C. §1983. The jurisdiction of the Court is invoked to secure the protection and redress the deprivation of rights guaranteed to persons by the Fourth and Fourteenth Amendments to the Constitution of the United States.

       3.     The jurisdiction of the Court over these claims is founded on 28 U.S.C. §§1331 and 1343.

4.      This Court has supplemental jurisdiction over the related state causes of action pleaded herein pursuant to 28 U.S.C. §1367.

5.      Venue is proper in this district, based upon the fact that a substantial part of the events or omissions which gave rise to the claims asserted herein occurred within the district.

## PARTIES

6.      At all times hereinafter mentioned, plaintiff, ANEURY PERALTA ("PERALTA" or "Plaintiff"), was a resident of the County of New York, City and State of New York.

7.      Upon information and belief, at all times hereinafter mentioned, defendant the CITY OF NEW YORK (hereinafter, "CITY") is a municipal corporation established under and by virtue of the laws of the State of New York.

8.      At all times hereinafter mentioned, defendant POLICE STEVEN GLINER (hereinafter, "GLINER") was a police officer employed by the New York City Police Department (hereinafter, "NYPD").

9.      At all times hereinafter mentioned, defendant POLICE SHAUN TABLANTE, (hereinafter, "TABLANTE") was a police officer employed by the NYPD.

10.     At all times hereinafter mentioned, defendant SERGEANT JOHN FERRARA, (hereinafter, "FERRARA"), was a supervisory police officer employed by the NYPD.

11.     At all times hereinafter mentioned, the CITY maintained, operated, controlled and supervised the NYPD, as a police department under the CITY.

12.     At all times hereinafter mentioned, the NYPD employed police officers who performed law enforcement duties for and on behalf of the CITY within the CITY's territorial

limits, including GLINER, TABLANTE and FERRARA, the individual defendants named herein.

13. At all times hereinafter mentioned, the individual defendants were acting in the course and within the scope of their employment, as law enforcement officers and employees of the CITY.

14. At all times hereinafter mentioned, the individual defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the CITY and State of New York, and under the authority of their office as law enforcement officers.

## RELEVANT FACTUAL BACKGROUND

15. On May 6, 2011, at about 9:00 AM, PERALTA was driving to the funeral of his aunt with members of his family in a convoy of two cars.

16. Plaintiff's father and uncle were in the car in front which Plaintiff's uncle was driving, while Plaintiff and other family members were in the second car which Plaintiff was driving.

17. While westbound on 125th Street towards 2nd Avenue, in Manhattan, both cars drove past a truck which was stopped as a result of police activity, and continued towards Third Avenue.

18. At Third Avenue, Plaintiff's uncle's car made a right turn at the traffic light just before the light turned red. Plaintiff stopped at the light waiting for the light to turn green again before proceeding.

19. When the light turned green, and as Plaintiff was beginning to make a right turn

3

onto Third Avenue, GLINER drove up alongside Plaintiff's car, and after looking into the rear seat of Plaintiff's car, signaled for Plaintiff to go into the parking lane.

20. Confused as to what he had done wrong, Plaintiff still obeyed GLINER and parked in the parking lane as he was directed.

21. GLINER then parked his vehicle adjacent to Plaintiff's car, blocking the driver's side door. GLINER then stated Plaintiff through the driver's side window, "You are under arrest" as GLINER unbuttoned the first three buttons of his uniform shirt and placed his left wrist inside his shirt.

22. Plaintiff, who thought this was some kind of joke, shot back "Are you an officer or an actor?" thinking that GLINER may have been part of a movie being shot.

23. GLINER then bellowed to everyone in Plaintiff's vehicle, "Get the fuck out of the car."

24. As the passengers in Plaintiff's car exited, Plaintiff who could not get out of his car because GLINER's vehicle was blocking the driver's side door, asked GLINER why he was being arrested.

25. GLINER's response was, "You asshole, you hit me back there while I was standing." .

26 Still confused as to what was going on, Plaintiff noticed GLINER call for back up, and within minutes, the place was swarming with police officers who arrived in five cars.

27. After the arrival of back-up, and GLINER conferring with the back-up officers, TABLANTE approached Plaintiff and ordered Plaintiff out of his car. TABLANTE then placed Plaintiff in handcuffs stating that Plaintiff was under arrest.

28. Plaintiff was then taken in a police car to the precinct for the first time in his life. Plaintiff arrived at the precinct around 9:30 AM, and was processed; Plaintiff's mug shots and fingerprints were taken.

29. Plaintiff kept asking when defendants would release him so he could attend the funeral of his aunt but was told to be patient.

30. At about 12 noon, Plaintiff was allowed to call his father who informed Plaintiff that they had just left the church and were on their way to the cemetery.

31. At about 1:30 PM, Plaintiff called his father again, and informed his father that he did not think that defendants would let him out. Plaintiff then asked his father to bring him red Gatorade, vanilla Nutriment and some honey Halls since Plaintiff had not eaten anything since the previous afternoon and was feeling dizzy, thirsty and dehydrated.

32. Around 2:00 PM, Plaintiff's father delivered the items which Plaintiff had requested him to bring to the Precinct front desk to be given to the Plaintiff. However, although defendants took the items, they never gave any of it to the Plaintiff.

33. When Plaintiff asked one Officer Sanchez what had happened to the things his father had brought for him, Officer Sanchez stated that he did not know.

34. A little while later, Plaintiff called his father to request for the same items to be brought since he did not get the first ones which he delivered at the front desk for him. A few minutes later, Plaintiff spoke with his father who confirmed that he delivered the items again at the front desk of the precinct. Plaintiff still did not get the items. Plaintiff's father brought the same items a third time and still Plaintiff did not get them. That was when Plaintiff figured that someone did not want him to receive those things.

35. Around 3:30 PM, Plaintiff complained to Officer Sanchez that he did not think it was proper or fair for anyone at the precinct to keep for themselves, the items that his father had brought for him instead of telling his father that they would not deliver those items to the Plaintiff.

36. Later, Plaintiff asked TABLANTE what happened to the things which his father had brought for him, and TABLANTE stated that "the sergeant" did not want anyone bringing Plaintiff anything from the outside. Plaintiff then observed TABLANTE place on his desk top two packs of honey Halls which Plaintiff believes were the ones his father had previously brought for Plaintiff.

37. Before Plaintiff requested his father to bring the aforesaid items for him, Plaintiff had observed some of his fellow cell mates receive chips and sandwiches from their respective arresting officers.

38. When TABLANTE left the vicinity of where Plaintiff was being held, Plaintiff asked Officer Sanchez for some water, at least, as Plaintiff's throat was starting to hurt. Officer Sanchez asked to be given a little time to see what he could do for Plaintiff.

39. About 20 minutes later, Officer Sanchez left the room and returned with a liter of bottled water which he handed to Plaintiff telling Plaintiff to drink it quickly before Plaintiff got him in trouble.

40. Just about when Plaintiff was taking the first sip of water, FERRARA appeared from nowhere and yelled at Officer Sanchez, "Why the hell do you give him that. Don't you know he tried to kill one of our brothers today?" Plaintiff protested that at no time did he try to kill anyone.

6

41.     Officer Sanchez then took back the water from Plaintiff and tossed it in the trash can nearby as Plaintiff watched. When FERRARA left the area, Officer Sanchez advised Plaintiff to keep his mouth shut until his arraignment since he was not getting any cooperation in the precinct.

42.     Between 5:00 and 5:30 PM, a female sergeant came to interview Plaintiff, and after learning for how long Plaintiff had been at the precinct, two police officers came and took Plaintiff downtown.

43.     Plaintiff remained in police custody until his arraignment on Saturday, May 7, 2011, on Assault in the Second Degree (PL 120.054) and Leaving the Scene of an Accident (VTL 600(2) (a) (F-SPI). TABLANTE executed the Felony Complaint while GLINER executed the Supporting Deposition.

44.     Plaintiff was finally released from custody at about 4:00 PM on Saturday, May 7, 2011.

45.     Defendants continued to prosecute Plaintiff on the aforesaid Felony Complaint until February 4, 2013, when Plaintiff was acquitted of all charges after trial.

## COUNT 1: 42 U.S.C. §1983
## UNLAWFUL SEARCH AND SEIZURE

46.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "45" as if fully set forth herein.

47.     The defendants violated Plaintiff's civil and constitutional rights under the Fourth Amendment by unlawful search and seizure of his person from May 6, 2011 until May 7, 2011,

while he remained in police custody until Plaintiff was arraigned before a judge, and released at about 4 P.M.

48. By reason of the foregoing, Plaintiff has suffered loss and damage.

## COUNT II: 42 U.S.C. §1983 MALICIOUS PROSECUTION

49. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "48" as if fully set forth herein.

50. Based upon the sworn false allegations of GLINER, and acting in concert with TABLANTE and FERRARA, defendants commenced and continued to prosecute PERALTA for a crime that never took place, with malice and without reasonable or probable cause to believe that PERALTA is guilty of the crime.

51. Said criminal prosecution required numerous court appearances by Plaintiff and Plaintiff had to face a trial on said charges.

52. Said criminal prosecution terminated in favor of PERALTA on February 4, 2013, when plaintiff was acquitted after a trial, and all charges against him dismissed.

53. By reason of the foregoing, defendants have violated Plaintiff's civil and constitutional rights and Plaintiff has suffered loss and damage.

## COUNT III: COMMON LAW FALSE ARREST

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "53" as if fully set forth herein.

55. Defendants and their agents had no reasonable or probable cause to believe that

Plaintiff had committed the crime he was accused of on May 6, 2011.

56. Defendants detained Plaintiff in police custody from May 6, 2011, at about 9:00 AM until May 7, 2011, at about 4:00 PM, without Plaintiff's consent, and deliberately deprived Plaintiff of food and nourishment during said detention

57. By reason of the foregoing, Plaintiff has suffered loss and damage.

### COUNT IV: COMMON LAW MALICIOUS PROSECUTION

58. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "57" as if fully set forth herein.

59. The aforesaid malicious prosecution of PERALTA ended in his favor when he was acquitted after trial, and all charges against him dismissed on February 4, 2013.

60. By reason of the foregoing, plaintiff has suffered loss and damage.

### COUNT V: CONVERSION

61. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "60" as if fully set forth herein.

62. Defendants converted to their own use and for their own benefit, the aforesaid food items and drinks which PERALTA's father brought to the station house for PERALTA's use and sustenance.

63. PERALTA did not consent to the defendants' conversion of said items for their own use and benefit.

64. By reason of the foregoing, defendants have unlawfully converted PERALTA's

9

said property and PERALTA has thereby suffered loss and damage.

65.     Jury trial is demanded for all matters triable by jury.

**WHEREFORE,** plaintiffs request that the Court grant the following reliefs:

a)      On COUNT I, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

b)      On COUNT II, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

c)      On COUNT III, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

d)      On COUNT IV, compensatory damages in the sum of THIRTY DOLLARS ($30.00).

e)      Punitive damages in an amount to be determined at trial.

f)      Attorney's fees, costs, and such other or further relief as to this Court shall seem just and proper in the circumstances.

Dated:  New York, New York
        July 29, 2015

                                        LAW OFFICES OF K.C. OKOLI, P.C.
                                        Attorneys for Plaintiff
                                        ANEURY PERALTA
                                        330 Seventh Avenue
                                        15th Floor
                                        New York, N.Y. 10001
                                        (212) 564-8152

                                        _____/s/_____
                                        By: K.C. OKOLI, ESQ.

**FOR SERVICE ON:**

ALEXANDER M. NOBLE
Assistant Corporation Counsel
Special Federal Litigation
New York City Law Department
100 Church Street, Room 3-310
New York, New York 10007
(212) 356-2357